[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON MOTIONS TO DISMISS OF DEFENDANT BREWSTER FOODS FOR LACK OF PERSONAL JURISDICTION
The plaintiffs, David and Marie Goldstein of Westport, Connecticut, originally brought this products liability/loss of consortium action by a complaint dated January 31, 1996. In their original complaint, the plaintiffs alleged that in October of 1993, David Goldstein sustained certain serious physical injuries when he ingested a nutritional supplement known as PB 8, and that as a result of those injuries, he and his wife, Marie Goldstein, suffered several additional injuries and losses. Named as defendants in the original complaint were Nutrition Now, Inc. ("Nutrition Now"), a Delaware corporation with its principal place of business in Vancouver, Washington, American Type Culture Collection, Inc., a Washington, D.C. corporation with its principal place of business in Rockville, Maryland, and Food For Thought Natural Foods Market, Inc. ("Food For Thought"), a Connecticut corporation with its principal place of business in Westport, Connecticut. The plaintiffs alleged, inter alia: that Nutrition Now designed, prepared, assembled, tested, packaged, labeled, advertised, marketed and sold the PB 8 capsules that injured Mr. Goldstein; that American Type Culture Collection designed, prepared, assembled, tested, packaged, labeled, advertised, marketed and sold certain bacterial cultures that were used by Nutrition Now as component parts of its PB 8 product; and that Food For Thought made the final retail sale of the particular PB 8 capsules that injured Mr. Goldstein.
Thereafter, Food For Thought filed a so-called "apportionment complaint," under the purported authority of Public Act 95-111 and General Statutes § 52-572o, against several additional "apportionment defendants," all of which had allegedly participated or sold and supplied ingredients used in the manufacture of PB 8. The new defendants were Cappseals, Inc., a Washington corporation with its sole place of business in Vancouver, Washington, which allegedly put the ingredients for PB 8 into capsules and packaged the capsules in sealed containers for retail sale, Forage Research, Inc. d/b/a Star Labs, Inc. ("Forage Research"),[1] a Missouri corporation with its CT Page 11787 principal place of business in Clarksdale, Missouri, which allegedly sold a bacterial product known as ProBiotic Supplement that was used as a component of PB 8, and Stauber Chemical, Inc. ("Stauber"),[2] a California corporation with its principal place of business in Brea, California, which allegedly sold certain other bacterial products that were also used as components of PB 8. The plaintiffs then pled over against the apportionment defendants, bringing direct claims for damages against each of them by an Amended Complaint dated August 27, 1997.
Thereafter, Stauber filed a third-party complaint against Test Labs, Inc. d/b/a Brewster Foods ("Brewster Foods" or "Brewster"), a California corporation with its principal place of business in Reseda, California, claiming that Brewster had supplied the PB 8 components it had sold to Nutrition Now, and thus that Brewster should be required to reimburse or indemnify it for or contribute to the payment of any damages that might be awarded against it in this case.[3] Nutrition Now then followed Stauber's lead by filing its own third-party complaint and cross-claim against Brewster, based on similar claims and allegations.[4] Plaintiffs David and Marie Goldstein did not plead over and file separate claims against Brewster.
Brewster then filed a fourth-party complaint against Wellington Foods, Inc. ("Wellington"), a California corporation with its principal place of business in Long Beach, California, claiming that Wellington had supplied certain materials used in the product it had supplied to Nutrition Now, and thus that it, not Brewster, should be held responsible for paying any damages that might be awarded in this case due to injuries resulting from the defective condition of that product. Finally, Stauber amended its third-party complaint against Brewster to add its-own separate claims against Wellington based on the facts alleged in Brewster's fourth-party complaint.[5] With Wellington as with Brewster, Plaintiffs David and Marie Goldstein did not plead over.
The case is now before this Court for decision on Brewster's motion to dismiss the third-party complaint of defendant/third-party plaintiff Stauber dated March 26, 1997, and its later motion to dismiss the third-party complaint and cross-claim of defendant/third-party plaintiff Nutrition Now dated January 26, 1998. For the purposes of this decision, the Court will refer to Stauber and Nutrition Now as "plaintiffs." CT Page 11788
 I. ISSUES PRESENTED FOR THE COURT'S DECISION
Before discussing the merits of Brewster's pending motions, the Court must address two important procedural matters which materially affect the scope of its review.
 A. Brewster's Motion To Dismiss the The Third-Party Complaint of Plaintiff Stauber
First, the Court must observe that Brewster's initial, March 26, 1997 motion to dismiss the third-party action of plaintiff Stauber has recently been rendered moot by the granting of Stauber's parallel motions to dismiss all claims against it for lack of personal jurisdiction. Stauber's third-party claims against Brewster, as previously noted, were all contingent upon the establishment of its own liability to pay damages in this case. Therefore, when the Court issued its August 9, 1999 Memorandum of Decision dismissing all claims against Stauber, it not only eliminated any possibility that Stauber could be required to pay damages in this case, but also eliminated any possibility that Brewster could be required to indemnify or reimburse Stauber for, or otherwise contribute to the payment of, any such damages.
Against this background, the Court's ruling on Stauber's motions to dismiss fully resolved all aspects of its controversy with Brewster in this case. Therefore, since nothing the Court can do in deciding Brewster's motion to dismiss Stauber's claims against it can in any way affect the parties' respective rights or liabilities in this case, that motion has become moot, and the Court must decline to decide it on the merits. See generallyLoisel v. Rowe, 233 Conn. 370, 379, 382-83, 660 A.2d 323 (1995) (noting that "[w]hen, during the pendency of an appeal, events . . . occur that preclude an appellate court from granting any practical relief through its disposition of the merits, [the] case . . . become[s] moot" and "must be dismissed as moot" unless it is capable of repetition, yet evading review).
 B. Brewster's Motion To Dismiss The Third-Party Complaintand Cross-Claim Of Plaintiff Nutrition Now
Brewster filed its second motion to dismiss, challenging the third-party complaint and cross-claim of plaintiff Nutrition Now, on January 26, 1998, exactly five days after those pleadings were CT Page 11789 filed. In that motion, Brewster's only substantive allegations were as follows:
 Brewster Foods has no business contacts within the State of Connecticut and is not subjected to personal jurisdiction under Connecticut's long arm statute, C.G.S. § 33-411. Additionally, Brewster Foods has no minimum contacts with the State of Connecticut so as to meet the requirements of federal due process in conferring personal jurisdiction over Brewster Foods in the State of Connecticut.
Brewster Motion to Dismiss II (1/26/98), p. 1.
Brewster did not support the above-described motion with any accompanying affidavits, evidentiary materials or legal memoranda. Instead, representing that the factual and legal grounds for the motion were identical to those advanced in support of its initial motion to dismiss the third-party complaint of plaintiff Stauber, it adopted the arguments presented in support of that earlier motion as follows:
 Brewster Foods previously filed a Motion to Dismiss the third party complaint of Stauber Performance Ingredients ("Stauber") on these very same grounds. Brewster Foods hereby incorporates their memorandum of law in support of their motion to dismiss, dated March 26, 1997, as though more fully set forth herein. The arguments are identical as are the issues, research and conclusions. Additionally, any supplemental memorandum filed on behalf of Brewster Foods in support of their Motion to Dismiss shall not only apply to Stauber's third party action, but to Nutrition Now's third party complaint and crossclaim, as well.
Brewster's Motion to Dismiss II (1/26/98), pp. 1-2 (Emphasis added).
In its initial Memorandum of Law in Support of Motion to Dismiss dated March 26, 1997, Brewster argued that it was not subject to this Court's jurisdiction under the Connecticut long-arm statute because it had never engaged in any conduct falling within that statute's limited scope. Relying upon the allegations of Stauber's third-party complaint and the facts set forth in a sworn affidavit from its President, Gregory L. Brewster, dated March 25, 1997, it argued, more specifically: (1) that the cause of action stated in the third-party complaint did not arise out CT Page 11790 of any contract allegedly made or to be performed by it in this State; (2) that said cause of action did not arise out of any business it allegedly solicited in Connecticut; (3) that said cause of action did not arise out of any tortious conduct by it in this State, for it had never engaged in any conduct, let alone tortious conduct, in this State; and (4) that said cause of action did not arise out of its production, manufacture or distribution of any goods with the reasonable expectation that such goods were to be used or consumed in this State, since it never had any basis upon which to expect that any of its goods would be used or consumed in Connecticut.
Brewster's original argument as to why this Court could not exercise personal jurisdiction over it without violating the Due Process Clause of the Fourteenth Amendment to the United States Constitution, as presented in its March 26, 1997 Memorandum in Support of Motion to Dismiss, was that it lacked sufficient "minimum contacts" with this State to make the assertion of such jurisdiction consistent with traditional notions of fair play and substantial justice. On this score, relying again upon the March 25, 1997 affidavit of its President, Gregory L. Brewster, Brewster argued that it was not registered to do business in Connecticut and that it had never purposefully availed itself of the privilege of conducting activities within this State, thereby invoking the benefits and protections of its laws.
Brewster did not submit any additional factual or legal materials in support of its Motion to Dismiss the third-party complaint and cross-claim of plaintiff Nutrition Now until February 12, 1999, when upon the completion of jurisdictional discovery it filed a lengthy Supplemental Memorandum of Law In Support of Motion to Dismiss ("Supplemental Memorandum"). In its Supplemental Memorandum, Brewster not only rearticulated and offered additional evidentiary support for its original statutory and constitutional arguments, but advanced several new grounds for dismissing the claims brought against it by Nutrition Now. Among its new arguments, none of which was brought to Nutrition Now's attention before the Supplemental Memorandum was filed, were the following: (1) that Nutrition Now cannot lawfully bring an action under the Connecticut long-arm statute because it is not a "resident of this state or . . . person having a usual place of business in this state"; General Statutes § 33-929
(f); (2) that there were certain irregularities in the procedures by which Nutrition Now commenced its pending third-party claim and cross-claim; and (3) that regardless of its decision on CT Page 11791 Brewster's jurisdictional challenge, the Court should dismiss this case under the doctrine of forum non conveniens.
Not surprisingly, a dispute has now arisen between Nutrition Now and Brewster as to whether any of these eleventh-hour claims can fairly be decided on this motion. The defendant claims that they can be, while the plaintiff insists that they cannot. For the following reasons, the Court agrees with Nutrition Now that such new grounds are not proper bases for dismissing its pending claims.
The command of our Practice Book as to the procedure for challenging personal jurisdiction is very clear. Any such challenge must be made in the form of a motion to dismiss. Practice Book §§ 10-30, 10-31 (a)(2). Such a motion "must [be] . . . fil[ed] within thirty days of the filing of an appearance;" Practice Book § 10-30; and "shall always be filed with a supporting memorandum of law, and where appropriate, with supporting affidavits as to facts not apparent on the record." Practice Book § 10-31(b). "Any claim of lack of jurisdiction over the person . . . is waived if not raised by a motion to dismiss . . . within the time provided by Sec. 10-30." Practice Book § 10-32.
One obvious purpose of the foregoing rules is to enable any defendant who wishes to challenge the Court's jurisdiction to do so at the very beginning of the case, litigating that issue to conclusion before devoting much potentially unnecessary time and money to preparing his defense on a case that should never have come before the court. Because any defendant who truly wishes to pursue such a challenge has a powerful incentive to do so with dispatch, a defendant who fails to file his motion in the time and manner prescribed by law can fairly be deemed to have waived his right to pursue such a challenge at all.
Another equally important purpose of the rules, however, is to protect the courts from unnecessarily expending limited judicial resources to the processing of cases that are destined for dismissal. To avoid such unnecessary expenditures of judicial resources, the rules require defendants to present their challenges in timely fashion, with full and fair notice of the grounds upon which they base them. When the rules are strictly complied with, jurisdictional challenges can be responded to promptly and effectively and resolved with optimum fairness and efficiency. Because anything less than strict enforcement would CT Page 11792 inexorably lead to unfairness and inefficiency in resolving jurisdictional challenges, as well as to waste and delay, pending the resolution of such challenges, in preparing cases for uncertain trials, the mandatory penalty for non-compliance is appropriately the forfeiture forever of the right to pursue a jurisdictional challenge.
Against this background, a defendant seeking dismissal must not only file his motion within the thirty-day time period specified by the Practice Book, but must in that same period identify all of the grounds upon which he seeks to have that motion granted. Because the rules clearly contemplate that a motion to dismiss and its accompanying memorandum must identify the grounds upon which it is based, a defendant's failure to identify a ground for dismissal within that thirty-day time period is just as much a waiver of the right to pursue dismissal on that ground as if he never filed a timely motion to dismiss on any ground.
In this case, by expressly basing its Motion to Dismiss the claims of Nutrition Now upon the "very same grounds" as those it advanced in support of its motion to dismiss the third-party complaint of plaintiff Stauber, and presenting no additional grounds in support of the later motion within thirty days of the filing of the pleadings therein challenged, Brewster limited itself to those grounds, to the exclusion of all others, as bases for granting the later motion. Therefore, in deciding that motion, this Court must limit its consideration to those grounds, as originally identified in Brewster's March 26, 1997 memorandum in support of its motion to dismiss the third-party complaint of plaintiff Stauber. By the same token, it must reject as a basis for dismissal any new ground advanced for the first time in Brewster's Supplemental Memorandum of February 12, 1999. Brewster forfeited its right to seek dismissal on that ground by failing to assert it within the time prescribed by law. Practice Book § 10-30 et seq.
 II. GENERAL PRINCIPLES
In order to assert personal jurisdiction over a foreign corporation, a court must determine that two conditions are met. First, there must be a jurisdictional statute that reaches the conduct of the defendant. Fuehrer v. Owens-Corning FiberglassCorp., 673 F. Sup. 1150, 1153 (D.Conn. 1986). Second, even where a statute purports to grant jurisdiction, the exercise of that CT Page 11793 jurisdiction under the circumstances presented must not exceed constitutional due process limitations, which require that the defendant have "minimum contacts" with the state sufficient that it would reasonably anticipate being haled into court there. Id.
at 1153.
When a motion to dismiss for lack of personal jurisdiction raises a factual question that cannot be decided on the face of the record, the burden of proof is on the plaintiffs to present evidence which will establish jurisdiction. Standard Tallow Corp.v. Jowdy, 190 Conn. 48, 54, 459 A.2d 503 (1983). To meet this burden, the plaintiffs must do more than merely rely on conclusory allegations in their complaint. Instead, they must make at least a prima facie showing of jurisdiction through their own affidavits or supporting materials. Fuehrer v. Owens-CorningFiberglass Corp., supra, 673 F. Supp. at 1153. A decision to grant a motion to dismiss may appropriately be based upon uncontroverted affidavits or materials from the party seeking dismissal. Id.
 III. JURISDICTION UNDER THE STATE LONG-ARM STATUTE
In Connecticut, jurisdiction over a foreign corporation must be predicated upon General Statutes § 33-929, which provides in part as follows:
 (f) Every foreign corporation shall be subject to suit in this state, by a resident of this state or by a person having a usual place of business in this state, whether or not such foreign corporation is transacting or has transacted business in this state and whether or not it is engaged exclusively in interstate or foreign commerce, on any cause of action arising as follows: . . . (3) out of the production, manufacture or distribution of goods by such corporation with the reasonable expectation that such goods are to be used or consumed in this state and are so used or consumed, regardless of how or where the goods were produced, manufactured, marketed or sold or whether or not through the medium of independent contractors or dealers[.]
To meet its burden of proving that this Court has statutory jurisdiction over Brewster, Nutrition Now has attempted to show that Brewster's challenged actions bring it within the scope of Section 33-929 (f)(3). CT Page 11794
To establish jurisdiction over an out-of-state corporation under Section 33-929 (f)(3), the plaintiffs must prove both that their "cause of action aris[es] . . . out of the production, manufacture or distribution of goods by such corporation with the reasonable expectation that such goods are to be used or consumed in this state" and that goods so produced, manufactured or distributed were actually "used or consumed [here], regardless of how or where they were produced, manufactured, marketed or sold or whether or not through the medium of independent contractors or dealers[.]" The parties agree that here, as in a claim of jurisdiction based on the alleged repeated solicitation of business under Section 33-929 (f)(2), "the phrase "arising out of in [Section 33-929 (f)] . . . does not require a causal connection between the defendant's forum-directed activities and the plaintiffs' lawsuit." Thomason v. Chemical Bank, supra,234 Conn. at 295. Instead, to paraphrase the Thomason Court's holding under Section 33-929 (f)(2), and thereby adapt it the instant claim under Section 33-929 (f)(3), a plaintiffs "cause of action aris[es] . . . out of [the defendant's] production, manufacture or distribution of goods . . . with the reasonable expectation that such goods are to be used or consumed in this state," if
 at the time the defendant engaged in such [production, manufacture or distribution of goods] . . ., it was reasonably foreseeable that, as a result of [such production, manufacture or distribution] . . ., the defendant could be sued in Connecticut . . . on a cause of action similar to that now being brought by the plaintiffs.
 . . . [A] plaintiff need not show that, because of the acts of [production, manufacture or distribution of goods . . . with the reasonable expectation that such goods are to be used or consumed in this state,] the defendant was on notice that it might be sued by the plaintiff himself or herself. . . . A plaintiff need only demonstrate that the defendant could reasonably have anticipated being haled into court here by some person who had [used or consumed goods it produced, manufactured or distributed with the reasonable expectation that such goods would be used or consumed in Connecticut] . . . and that the plaintiffs cause of action is not materially different from an action that might have resulted directly from that [use or consumption].
Thomason v. Chemical Bank, supra, 234 Conn. at 296. (Emphasis in original.) CT Page 11795
The plaintiffs do not claim, nor on this record could they, that defendant Brewster produced, manufactured or distributed any of the goods that allegedly harmed plaintiff David Goldstein with the expectation, reasonable or otherwise, that such goods would be used or consumed in Connecticut. Here, to the contrary, Brewster has presented uncontroverted evidence from its President, Gregory L. Brewster, that the only role it might have played in manufacturing or distributing any such goods was not such as to give it any notice as to how or where they would be ultimately be used or consumed.
Mr. Brewster averred, more particularly, that at the time in question, Brewster Foods was a California corporation which manufactured bacterial products of the kind allegedly used to manufacture PB 8, but sold those products to only two customers, neither of which was located in Connecticut. One such customer was plaintiff Stauber, a California corporation doing business as an independent marketing distributor in Brea, California. According to Mr. Brewster, Stauber regularly purchased Brewster's products for resale and distribution to its own separate customers, all food supplement or related manufacturing companies or manufacturing chemists that had no relationship with Brewster. When Stauber purchased Brewster's products for one of its customers, it would contact Brewster directly, order the products in its own name and on its own account, and instruct Brewster to ship them directly to its customer. Once Brewster filled an order from Stauber by shipping its products to one of Stauber's customers, it lost all interest in and control over those products. Therefore, Brewster never learned or had reason to learn from any such customer how or where the customer would use or distribute its products after the products were delivered.
One Stauber customer to which Brewster admittedly shipped quantities of its bacterial products was plaintiff Nutrition Now. According to Mr. Brewster, Brewster filled orders for such products from Stauber by shipping the products, on Stauber's instructions, to Nutrition Now in Portland, Oregon. On each such occasion, Brewster's only contact about the order was directly with Stauber, its only invoice for the products was sent to Stauber, and its only payment for the products was received from Stauber. Therefore, because Brewster had no relationship at all with Nutrition Now, and no continuing interest in or control over the goods shipped to Nutrition Now once it delivered those goods to Portland, Brewster never learned or had reason to learn that CT Page 11796 those goods would one day be sold and used in Connecticut.
Even so, relying on Thomason, Nutrition Now claims that this Court has personal jurisdiction over Brewster because since 1992, Brewster has shipped small quantities of its products to Connecticut on behalf of plaintiff Stauber. On those occasions, claims Nutrition Now, Brewster has filled orders from Stauber for bacterial products of the types involved in this case[6] by shipping those products, on Stauber's instructions, to a business called Naturemost of New England ("Naturemost")[7] in Middletown, Connecticut. The record reveals that each such order was the third of three orders for the products that were placed in the following sequence. First, Naturemost, a Connecticut manufacturer and distributor of food supplements, ordered the products from its supplier of ingredients and raw materials, the Generichem Corporation ("Generichem") of Totowa, New Jersey. Generichem, in turn, filled its order from Naturemost by placing its own separate order for the products with plaintiff Stauber and directing Stauber to ship the products directly to Naturemost. Finally, Stauber, in response to Generichem's order, placed its own separate order for the products with defendant Brewster, instructing it, in turn, to ship the products directly to Naturemost in Middletown. On the basis of those facts, Nutrition Now argues, under Thomason that this Court has jurisdiction over Brewster under Section 33-929 (f)(3) because Brewster "could reasonably have anticipated being haled into court here by some person who had [used or consumed goods it reasonably expected to be used or consumed in Connecticut] . . . and that the plaintiffs cause of action is not materially different from an action that might have resulted directly from that [use or consumption]." Id. at 296.
Brewster disputes the foregoing analysis for two basic reasons, both of which were argued by plaintiff Stauber in support of its own parallel motions to dismiss, which this Court granted on August 9, 1999. First, it claims that its transactions with Stauber have not involved the "distribution of goods . . .with the reasonable expectation that such goods [we]re to be usedor consumed in this state," as is required for the exercise of jurisdiction under Section 33-929 (f)(3). Second, it insists that even if those transactions can be found to satisfy the foregoing statutory requirement, they have been so infrequent, indirect and insubstantial as not to put it on fair notice that it might be haled into court here by some person who claimed to have been harmed by the use or consumption of its goods in the State of CT Page 11797 Connecticut.
 A. Defendant's Claimed Lack of Reasonable Expectation That Goods It Distributed to Connecticut Were to Be Used or Consumed Here
The defendant's first argument is made in two parts, both of which are tied to the fact that all of its transactions with Stauber have all involved the sale and delivery of raw materials rather than of finished products. Initially, it claims that such transactions have not involved the "distribution of goods . . . with the reasonable expectation that such goods [we]re to be used or consumed in this state" because the only way it could have anticipated that its goods would ever be used or consumed here was as components or ingredients of other products into which they would later be incorporated. On this score it argues: first, that finished goods are distinct and different from the raw materials with which they are made; second, that the use or consumption of a finished product therefore does not constitute the use or consumption of its components or ingredients; and, thus, third, that when "goods" are delivered to Connecticut with the reasonable anticipation that the only way in which they will be used or consumed here is as components or ingredients of other products into which they first must be incorporated, said delivery does not constitute the "distribution of goods . . . with the "reasonable expectation that such goods are to be used or consumed in this state." Id.
In support of this argument, the defendant relies on Spahl v.Raymark Industries, No. CV95 50359 (Sep. 9, 1996)1996 Ct. Sup. 5395, where Judge Sferrazza made a similar analysis in dismissing claims against three Canadian suppliers of raw asbestos in an action to recover damages for injuries allegedly suffered while the plaintiffs were working with asbestos cloth made from the defendants' raw asbestos. In announcing his decision under General Statutes § 33-411 (c)(3), the identical predecessor of the statutory subsection here at issue, Judge Sferrazza reasoned as follows:
Section 33-411 (c)(3) requires, before personal jurisdiction obtains, a reasonable expectation that "such goods" will be used or consumed in Connecticut and that "such goods" are actually used or consumed in the state. The "goods" which lies at the base of the cause of action in this case is asbestos cloth not raw asbestos ore. While mining companies might reasonably anticipate that the ore they extract will eventually be CT Page 11798 converted to other intermediate and finished products by others and that the transmogrified results could reach Connecticut, that expectation is not the one required by our long-arm statute. Rather, § 33-411 (c)(3) extends jurisdiction only to foreign companies who reasonably expect that the product they create will be used or consumed in Connecticut directly. An ingredient or component differs from the finished product into which the ingredient or component is placed.
 The plaintiffs' position was rejected in nearly identical circumstances by the U.S. District Court for Connecticut in two cases brought by other employees of American Optical against these defendants. In Szela v. Uniroyal, Civil Action No. H89-604 (April 19, 1991) and LeFleche v. Uniroyal, Civil Action No. H89-756 (April 19, 1991), Judge Nevas held that there was "an insufficient factual basis to sustain jurisdiction under § 33-411 (c)(3)" over suppliers of raw asbestos fiber which ultimately became the cloth used by American Optical.
 Under the plaintiffs' expansive interpretation of "goods" as applying to ingredients as well as finished products, no foreign corporation would fall outside of the scope of the long-arm statute. This interpretation would render the restrictive clauses of § 33-411 (c)(3) meaningless because any producer of raw material in the world would be subject to suit in Connecticut by virtue of having sold the raw material to others who could reasonably sell the finished products in Connecticut. Conceivably, a Bolivian tin mining company would be subject to suit in Connecticut because the tin supplied to a company in Taiwan was used to make a part of a toy manufactured in Mexico which was sold by a distributor in Illinois to a retail store in Connecticut which toy caused injury to a Connecticut resident because of the hardness of the tin part.
 The court holds that no personal jurisdiction obtained under our long-arm statute over foreign corporations whose only contact with Connecticut with respect to the cause of action was to supply raw material which was part of another product made by others which eventually was sold in Connecticut. The motions to dismiss are granted.
Id.
According to the defendant, the Spahl decision must be read to hold that a foreign corporation can never be haled into court CT Page 11799 in Connecticut based solely on its production, manufacture or distribution of goods, when the only way in which it is expected that such goods will be used or consumed in Connecticut is as parts or ingredients of another product. Such a reading, however, is fundamentally inconsistent with both the logic by which Judge Sferrazza explained his ruling and, not accidentally, the logic of our Supreme Court's decision in Thomason.
By observing, in particular, that the statute does not extend the Court's jurisdiction to those who merely "anticipate that the [products they produce, manufacture or distribute] will eventually be converted to other intermediate and finished products by others and that the transmogrified results could reach Connecticut[,]" Judge Sferrazza offered a narrower, more functional rationale for his ruling than that contended for by the defendant. His words suggest, as logic dictates, that when a defendant's goods are so incorporated into another product as to "convert" them into something new and different — changing their essential functions or characteristics, and thus "transmogrif[ying]" them — use or consumption of the new and different product cannot constitute use or consumption of the goods used to make the product, for such goods no longer exist, in form or in function. If this is true, then mere anticipation that such a new and different product will be used or consumed in Connecticut cannot give rise to a reasonable expectation that the goods used to make that product will thereby be used or consumed here.
By necessary implication, however, a similar conclusion cannot be reached when a defendant's goods are so incorporated into another product as not to lose their essential functions or characteristics. Many goods are used as components or ingredients of other products without being changed in any material way. Some are used exclusively as components or ingredients of other products, while others are used interchangeably, either as parts of other products or as separate products, in and of themselves. In either case, such goods, by their nature or design, retain their original form and functions both before and after they are incorporated into the products made from them. That is, if they work in a particular way before they are incorporated into the other products, they will continue to work in that same way after they have been so incorporated. By the same token, if they are in a defective condition, unreasonably dangerous to their ordinary user or consumer as they are originally constructed or configured, they will remain in that same condition when used as CT Page 11800 components or ingredients of other products. Plainly, no meaningful distinction can be made between the "direct" use or consumption of any such goods, before they are incorporated into other products, and their "indirect" use or consumption, after incorporation has taken place. Hence, whenever it is reasonably anticipated that a product into which such goods have been incorporated will be used or consumed in Connecticut, it must also be reasonably expected that such goods, as the unchanged components or ingredients of that product, will thereby be used or consumed here as well.
Against this background, this Court does not read Judge Sferrazza's decision or the statute it interprets to prohibit this Court from exercising personal jurisdiction over a foreign corporation when the only way the corporation expects its goods to be used or consumed in Connecticut is as parts of other products. Instead, it reads the decision and the statute to require any plaintiff who wishes to establish this Court's jurisdiction on that basis to present evidence, as part of its prima facie showing of jurisdictional facts, that when the defendant distributed its goods to Connecticut, it reasonably anticipated that the essential functions and characteristics of those goods would remain unchanged even after they were incorporated into the other products as parts of which they would be used or consumed. Otherwise stated in the words of the modern product liability doctrine, the plaintiff must make a prima facie
showing that the defendant reasonably expected the goods it distributed to Connecticut to be used or consumed here, either separately or as parts of other products, in substantially the same condition as they were when it first distributed them.
Such a rule, as previously noted, is consistent with our Supreme Court's decision in Thomason, on which the plaintiffs rely. There, to reiterate, the Court held that a plaintiffs "cause of action aris[es] . . . out of [the defendant's] production, manufacture or distribution of goods . . . with the reasonable expectation that such goods are to be used or consumed in this state," if
at the time the defendant engaged in such [production, manufacture or distribution of goods] . . ., it was reasonably foreseeable that, as a result of [such production, manufacture or distribution] . . ., the defendant could be sued in Connecticut . . . on a cause of action similar to that now being brought by the plaintiffs.
CT Page 11801
Id. at 296. (Emphasis added.) The present cause of action sounds in products liability. Thus, to bring the defendant within this Court's jurisdiction under Thomason, Nutrition Now must establish that when Brewster conducted its dealings with Stauber, it could reasonably foresee that as a result of those dealings it could be sued in Connecticut on a products liability claim.
A products liability claim in Connecticut has the following elements: (1) that the defendant was a product seller, within the meaning of the Connecticut Product Liability Act; (2) that the item which caused him harm was in fact the defendant's "product" within the meaning of the Act; (3) that the product, when it harmed him, was in a defective condition, unreasonably dangerous to its ordinary user or consumer; and (4) that the product was expected to and did reach its ultimate user or consumer in substantially the same condition as that in which it was sold, leased or bailed by the defendant. Bobryk v. Lincoln Amusements.Inc., No. CV95-0547084S (Jan. 5, 1996) 1996 Ct. Sup. 184, 188. In light of these essential elements, a defendant that produces, manufactures or distributes goods is subject to this Court's jurisdiction under Section 33-929 (f)(3) if, in so doing, it can reasonably foresee that those goods will be used or consumed in Connecticut in substantially the same condition as that in which the defendant first sold, leased or bailed them. It does not matter if the defendant's goods are incorporated into another product before they are used or consumed in Connecticut as long as their condition, when used or consumed here, is expected to be substantially similar to that in which the defendant first placed them into the stream of commerce.
In this case, Nutrition Now claims that defendant Brewster's products, when used as ingredients of Nutrition Now's finished product that allegedly injured plaintiff David Goldstein, reached this State in substantially the same condition as they were when Stauber first sold and delivered them to Nutrition Now. Stauber, more significantly, has made the same allegation in its amended third-party complaint against Brewster Foods and Wellington Foods. There is thus a basis on this record for inferring that when bacterial products like those sold by Brewster to Stauber are used, as intended, to make food supplements, they are packaged as delivered, without changing their essential functions or characteristics, and sold as such to the consuming public. The Court concludes, on this basis, that Nutrition Now has made aprima facie showing that Brewster distributed its raw materials CT Page 11802 to Connecticut with the reasonable expectation that such goods were to be used or consumed here in substantially the same condition as they were when it sold and delivered them.
The defendant's second reason for claiming that its prior business dealings with Stauber do not bring it within this Court's jurisdiction under Section 33-929 (f)(3) is that in conducting those dealings, it has never learned how Naturemost, the Connecticut business to which it shipped raw materials on instructions from Stauber, uses those materials, or where any finished product made from such materials is later marketed or consumed. Thus, though it concededly has shipped its goods to Connecticut, Brewster insists that it has not done so with any reasonable expectation that such goods are to be used or consumed here.
On this record, however, there is ample basis for concluding that when Brewster has shipped lactobacillus acidophilus and citrus bioflavonoid to Naturemost in Middletown, Connecticut, it has done so with the reasonable expectation that products made from those materials will be used or consumed in this state. This is true because, although Brewster may never have learned in what particular products its raw materials are used, it knows a great deal about the materials themselves, and thus about the reasons Stauber and Generichem have had them shipped here.
According to a second sworn affidavit from its President, Gregory L. Brewster, dated February 8, 1999, Brewster knows the following important facts about the materials it has shipped on behalf of Stauber to Connecticut:
 44. The lactobacillus acidophilus and citrus bioflavonoid which NatureMost Laboratories orders from Generichem Corporation are drop-shipped to NatureMost Laboratories at the explicit direction and request of Generichem Corporation and Stauber Performance Ingredients in order to save time and expense and to help preserve the integrity of the ingredients and raw materials.
 45. It would not make any sense to ship the ingredients or raw materials from Brewster Foods to Stauber Performance Ingredients to Generichem Corporation to NatureMost Laboratories. The integrity of the raw materials would most certainly be compromised.
46. Lactobacillus acidophilus is a live probiotic bacterial CT Page 11803 culture. Its maximum live cell viability is best maintained in a refrigerated environment. If lactobacillus acidophilus is removed from its environment for too long a period of time, the integrity is compromised. Therefore, it is normally shipped by refrigerated carrier or by overnight or 2d day delivery to minimize any loss of live cell viability.
 47. Citrus bioflavonoids are 100% natural antioxidant and nutrient substances derived from whole citrus fruit. To insure that these natural attributes are preserved to the fullest extent, a timely delivery is essential.
Affidavit of Gregory L. Brewster (2/8/99), ¶¶ 44-47.
The implication arising from this knowledge, which Generichem's President, Terrance W. Connolly, confirms to be true,[8] is that when Brewster ships lactobacillus acidophilus and citrus bioflavonoid to Connecticut, it does so knowing of the high probability that they will be used or consumed here. As perishable goods which must be refrigerated to preserve their integrity and/or their natural attributes as food ingredients, Brewster knows that their delivery must be timely, and. thus that they must be used at once when they are delivered. To ensure that this will happen, Brewster has cooperated with Stauber and Generichem by shipping them directly to the place where they will be used — Middletown, Connecticut. By the logic of Mess'rs. Brewster's and Connolly's Affidavits, it would make no sense to ship them to Middletown if they were intended to be used elsewhere.
It is true, of course, that upon using Brewster's raw materials to make food supplements or other finished products, Naturemost may market or distribute those products beyond the borders of Connecticut. In view of their perishable nature, however, they almost certainly do not go far. Moreover, both the name of the business to which they are delivered and its location — Naturemost of New England of Middletown, Connecticut — strongly suggest that wherever else they may be marketed, they are surely be marketed in Connecticut. In sum, the Court concludes that when Brewster does fills orders from Stauber by shipping its perishable bacterial products to Connecticut, it does so with the reasonable expectation that those goods will be used or consumed in this state.
 B. Defendant's Claimed Lack of Fair Notice That It Might Be HaledCT Page 11804 Into Court In Connecticut
Brewster's alternative basis for insisting that this Court cannot exercise jurisdiction over it under Section 33-929 (f)(3) is, to reiterate, that even if it can be found to have distributed goods to Connecticut with the reasonable expectation that such goods are to be used or consumed here, the transactions by which it has done so have been too infrequent, indirect and insubstantial to give it fair notice that as a result of those transactions it might one day be haled into court here. For the following reasons, the Court agrees, and therefore finds that Nutrition Now has failed to meet its burden of establishing jurisdiction on the facts here presented.
The twelve transactions by which Brewster distributed its goods to Connecticut in 1992 and 1993 have already been described in some detail. Each transaction, as previously noted, was between the defendant, a California corporation not licensed to do business in Connecticut, and Stauber, another California corporation that does business as an independent marketing distributor in Brea, California. On each occasion, Stauber contacted Brewster with an order for specific bacterial products and instructions as to where they were to be delivered. Brewster filled each order, as previously noted, by shipping the products to Naturemost of New England in Middletown, Connecticut. In all, Brewster billed Stauber a total of $9,782.50 for the twelve transactions. Those sales represented approximately one-quarter of one percent of Brewster's $3.84 million in gross sales during the two-year period in which they were made.
Since 1993, Brewster has continued to ship small quantities of its bacterial products to Naturemost on behalf of Stauber. According to Mr. Brewster, such sales, all initiated by Stauber, continue to represent the same small percentage of Brewster's gross annual sales as they did in 1993. Affidavit of Gregory L. Brewster (2/8/99), 6 ¶ 57.
Seen for what they truly were, the above-described transactions do not constitute and have not resulted from any commercial activities by Brewster that was purposefully directed to the State of Connecticut. Brewster, to reiterate, has never been licensed to do business in Connecticut or sought to do any business here notwithstanding its lack of a license. Accordingly, as its President has averred, it has never had an office or employees here, it has never solicited business or published CT Page 11805 advertising here, it has never had a sales force or even a telephone number here, it has never had an agent for service of process here, it has never owned, leased or possessed real or personal property here, and apart from its transactions with Stauber, it has never shipped any of its products here. In short, it has done nothing whatsoever to drum up business in Connecticut, and could hardly have imagined being haled into court here to defend itself in a lawsuit.
As for the twelve transactions in 1992-93, moreover, and the similar transactions in subsequent years, Brewster neither initiated them nor controlled them. Instead, they were initiated and controlled by Stauber, which alone determined, without input from Brewster, that the goods it ordered should be shipped to Connecticut.
In conclusion, Brewster's only contacts with the State of Connecticut have resulted exclusively from transactions initiated by others which Brewster did not solicit, direct or control. The transactions have been infrequent in number and insubstantial in volume. Resulting, as they have, from accommodations to plaintiff Stauber, its California customer, which in turn was accommodating its own New Jersey customer, Generichem, such transactions were not engaged in by Brewster to develop a Connecticut market for its products or a Connecticut clientele. As such, they were simply insufficient to put Brewster on notice that it might one day be haled into a Connecticut court to defend a civil lawsuit. The Court thus agrees with the defendant that all claims now pending against it must be dismissed for failure to satisfy the minimum jurisdictional requirements of Section 33-929 (f)(3).
 IV. JURISDICTION UNDER CONSTITUTIONAL DUE PROCESS STANDARDS
Defendant Brewster's fall-back argument is that even if Nutrition Now has established long-arm jurisdiction over it under General Statutes § 33-929 (f), which it has not, the record does not support a finding that Brewster has sufficient "minimum contacts" with Connecticut to satisfy due process standards. For the reasons that follow, the Court agrees that such minimum contacts have not been established, and thus concludes that all claims against Brewster must be dismissed on this basis as well.
"A state court may exercise personal jurisdiction over a nonresident defendant only so long as there exist "minimum contacts' between the defendant and the forum state." World- WideCT Page 11806Volkswagen Corp. v. Woodson, 444 U.S. 286, 291, 100 S.Ct. 559,62 L.Ed.2d 490 (1980). The contacts must be such that "maintenance of the suit does not offend traditional notions of fair play and substantial justice." International Shoe Co. v. Washington,326 U.S. 310, 326, 66 S.Ct. 154, 90 L.Ed.2d 95 (1945).
"The twin touchstones of due process analysis under the minimum contacts doctrine are foreseeability and fairness."United States Trust Co. v. Bohart, 197 Conn. 34, 41.495 A.2d 1034 (1985). "The specific facts of each case necessarily determine the outcome of a minimum contacts analysis." Id. at 42.
"It is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." Burger King Corp. v.Rudzewicz, 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528
(1985). However, "jurisdiction in these circumstances may not be avoided merely because the defendant did not physically enter the forum State. . . . So long as a commercial actor's efforts are `purposefully directed' toward residents of another State, [our Supreme Court has] . . . consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there." Id. at 476.
"Either `specific' jurisdiction or `general' jurisdiction can satisfy the constitutional requirement of sufficient minimum contacts between the defendant and the forum." Thomason v.Chemical Bank, supra, 234 Conn. at 288. A State can exercise "specific jurisdiction" over a defendant when the suit in question arises out of or relates to the defendant's contacts with the forum. Helicopteros Nacionales de Columbia. S.A. v.Hall, 466 U.S. 408, 414, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). A State can exercise "general jurisdiction" over a defendant when, though the suit in question does not arise out of or relate to the defendant's contacts with the forum, such contacts are "continuous and systematic." Id. at 414, 416.
In this case, there is plainly no basis for exercising specific jurisdiction over defendant Brewster, since this case does not arise out of or in any way relate to any of the defendant's very limited contacts with this state. If the defendant's goods were used at all to make PB 8, the nutritional supplement that allegedly injured plaintiff David Goldstein, they were ordered by Stauber in California, sent by Brewster to CT Page 11807 Nutrition Now in Portland, Oregon, and used by Nutrition Now, either in Portland or at some other location unknown to Stauber, to make the product in question. No alleged activity by defendant Brewster, upon which its liability in this case is sought to be established, is claimed to have involved or to have been related to any of its contacts with the State of Connecticut.
The defendant's contacts with Connecticut, moreover, have not been so "continuous and systematic" as to give this Court general jurisdiction over it under the prevailing constitutional test. To the contrary, for the reasons set forth in Part III.B of this Memorandum of Decision, supra, the defendant's only contacts with this state can best be described as infrequent, indirect and insubstantial. The defendant, to reiterate, has never been licensed to do business in this state and has never "purposefully directed" its commercial activities to this state or its consumers. It therefore cannot be haled before this Court to defend the instant lawsuit without violating its federal constitutional right not to be deprived of its property without due process of law. For that reason as well as the plaintiffs' failure to satisfy the minimum requirements of the Connecticut long-arm statute, the defendant's motions to dismiss for lack of personal jurisdiction must be granted.
It is so ordered this 23rd day of August, 1999.
Michael R. Sheldon, J.